

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-8-1997

# Teamsters Local 312 v. Matlack Inc

Precedential or Non-Precedential:

Docket 96-1268

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Teamsters Local 312 v. Matlack Inc" (1997). *1997 Decisions.* Paper 148.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/148

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 8, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-1268

TEAMSTERS LOCAL 312,
Appellant

v.

MATLACK, INC.

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 95-cv-05661)

Submitted Pursuant to Third Circuit LAR 34.1(a)
January 14, 1997

Before: SLOVITER, Chief Judge, GREENBERG and
SCIRICA, Circuit Judges

(Opinion filed July 8, 1997)

Mark P. Muller
Teamsters Local 312
Chester, PA 19013

 Attorney for Appellant

Charles E. Sykes
Bruckner & Sykes
Houston, TX 77057

 Attorney for Appellee

**OPINION OF THE COURT**

SLOVITER, <u>Chief Judge</u>.

This appeal presents the issue of the appropriate procedure to be used by the district court when it concludes that there were fundamental procedural irregularities in the course of an arbitration hearing between parties to a collective bargaining agreement.

**I.**

**A.**

<u>Historical Facts</u>

Teamsters Local 312, affiliated with the International Brotherhood of Teamsters, AFL-CIO, ("Local 312" or "the Union") is the certified bargaining unit for truck drivers and haulers operating in the Bensalem, Pennsylvania waste water transportation terminal of appellee Matlack, Inc. ("Matlack"). Local 312 and Matlack are partners to a Collective Bargaining Agreement ("CBA") that has been extended indefinitely by mutual agreement. As part of its operations, Matlack arranges for non-employee owner-operators who are under its supervision to drop off their trailers containing shipments of waste water to Matlack's Bensalem terminal. Those trailers arriving in Bensalem are not certified to haul waste water to their ultimate

2

destinations in New Jersey. Local 312 employees are responsible for obtaining the necessary health and safety certifications from Trenton, New Jersey and then hauling the deposited trailers to environmental treatment facilities in either Deepwater or Logan Township, New Jersey.

According to Article 50.1 of the parties' Collective Bargaining Agreement, which is entitled "Work Preservation," Matlack is expressly prohibited from diverting or subcontracting to any other plants, businesses or non-bargaining unit employees, or to any other mode of operation, any of the hauling work that was then performed or to be assigned to the bargaining unit. See Art. 50.1, App. at 38.1

Sometime in April 1994, employees of Local 312 noticed that the number of trailer loads of waste water arriving in the Bensalem terminal was decreasing markedly. After making some inquiries, the employees were informed that many of Matlack's incoming waste water loads were being deposited at another terminal in Elkton, Maryland. Based on this information, on June 1, 1994, Union President Timothy Lehman filed a grievance letter with the Company which constituted Step 1 of the grievance procedures set

_____

1. The provision reads in full:

Section 50.1 -- Work Preservation

For the purpose of preserving work and job opportunities for the employees covered by this Agreement, the Employer agrees that no operation, work or services of the kind, nature or type covered by, or presently performed or hereafter assigned to the collective bargaining unit by the Employer will be subcontracted, transferred, leased, diverted, assigned or conveyed in full or in part (hereinafter referred to as "divert" or "subcontract"), by the Employer to any other plant, business, person, or non-unit employees, or to any other mode of operation, unless specifically provided and permitted in this Agreement.

In addition, the Employer agrees that it will not, as hereinafter set forth, subcontract or divert the work presently performed by or hereafter assigned to, its employees to other business entities owned and/or controlled by the Employer, or its parent, subsidiaries or affiliates.

3

out in § 7.2 of the Collective Bargaining Agreement.2 The letter stated:

Please consider this letter as a formal grievance under our current collective bargaining agreement regarding waste water loads that were previously handled by the Bensalem, PA terminal and are now handled by your Elkton, MD terminal utilizing a tractor that was transferred from Swedesboro.

To the best of my knowledge, these loads originate in Muscatine, Iowa or other parts of the Northern Region and are relayed into New Jersey out of Elkton, MD.

We view this as a violation of Article 50 and, as such, request a meeting as scheduled at once to discuss.

App. at 41.

On August 9, 1994, Lehman met with Michael Lynch, the Bensalem Terminal Manager, in accordance with Step 2 of the grievance procedures to discuss the grievance contained in the letter. At the meeting Lynch informed Lehman that

_____

2. Section 7.2 of the Collective Bargaining Agreement describes the Grievance Procedures in relevant part:

Step 1. All grievances must be made known in writing to the other party within seven (7) working days after the reason for such grievance has occurred.

. . .

Step 2. If the disposition of the matter by the Terminal Manager in charge, or his duly authorized representative, is not satisfactory, the matter must be taken up by the Business Agent, and the Employer's Regional Representative, or other representatives of the Employer with authority to act, within five (5) working days of the written disposition set forth in Step 1.

. . .

Step 3. If the disposition of the matter by the Regional Representative or other representatives of the employer with authority to act, is not satisfactory either party has the right to file its grievance with the Joint Committee. . . .

App. at 18.

4

the waste water loads in question were originating from locations in addition to those in Muscatine, Iowa or other parts of the Northern Region. Lehman then made a handwritten amendment to the grievance letter indicating that the grievance was meant to cover all allegedly diverted shipments ever assigned to the Bensalem terminal, not only those suspected to originate from Muscatine, Iowa or "other parts of the Northern Region." App. at 41 ("Amended -- 8/9/94 -- 9:31 am -- To any waste water that came into and out of this terminal!"). Although Lynch refused to sign the amended grievance, he did not object to it, and Lehman noted this fact on the letter. Id.

Nothing was resolved at this grievance meeting or at a Joint Committee meeting held on September 12, 1994, in accordance with Step 3 of the grievance procedures. The Company maintained at both grievance proceedings that any shipments coming from Muscatine or elsewhere had never been actually "assigned" to Bensalem as contemplated by the "Work Preservation" guarantee of the CBA, but were part of "system-wide work" which could be dispatched to any terminal location without regard to the jurisdictional restriction in Article 50. The Union's position was that proof of a marked decrease in the number of wastewater shipments from locations such as Muscatine, in the absence of company evidence to the contrary, satisfied the contractually required presumption that work is being diverted to other, non-bargaining units in violation of Article 50.

The parties agreed to arbitration and a hearing was held on April 27, 1995 before Arbitrator Charles D. Long. Matlack was represented by J. Carlisle Peet and Local 312 by Mark Muller. There was considerable confusion in the course of the arbitration proceeding. At the outset of the hearing, Matlack's counsel announced that he wanted to raise two procedural defenses not previously mentioned in the prior grievance proceedings: the first, a "timeliness" objection arguing that the Union's June 1, 1994 grievance letter was filed after the seven day filing requirement set forth in the CBA; the second, an objection that the "scope" of the grievance contained in the letter was limited to those allegedly improper shipments that originated out of

5

Muscatine, Iowa alone and not those referred to by the clause "or other parts of the Northern Region" or by the handwritten amendment. Matlack also announced that it was not prepared to address the substantive issue of the grievance, namely whether there was an actual diversion of shipments "assigned" to Bensalem bargaining unit employees in violation of Article 50. App. at 190-92, 197.

After Union counsel objected to Matlack's attempt to focus the hearing only on the procedural aspects of the grievance letter, the arbitrator said to Matlack:

You'd better present your arguments as to what the grievance was and the scope of the substance, subject to jurisdiction hearing this, and then proceed on to the substance. So (inaudible) -- so far as it relates to the limited load that the company speaks of.

App. at 199.

Soon after, Matlack reiterated that it was unprepared to address anything beyond the scope of the grievance, to which the arbitrator replied, "I will try and make an effort, in order to determine how we can agree to that -- in effect, as long as we're all here, let's go with the Muscatine part of the substance." App at 201. He continued, "I will make . . . a determination on the scope of the issue prior to the holding of a second meeting, because that determination will determine whether or not the second day of hearing is necessary." Id.

Later, after confusion about the proper scope of a cross-examination, the arbitrator said,

Because everybody is here, I'm going to let the union proceed, even though the case may extend beyond Muscatine. If, after the hearing today, I determine that the issue is broader than just Muscatine, we'll have to reconvene for the company to deal with these other issues. And if it means recalling these particular witnesses so you can reopen cross-examination, I'll certainly permit you to do that.

App. at 216. Again, after more controversy over the scope of the day's hearing, the arbitrator said:

6

I am more concerned that, in resolving this problem, it is resolved on a full factual record and, therefore, if, in fact, the issue is determined to go beyond the scope of Muscatine, Iowa, I'll permit the company to address it at a subsequent time.

App. at 232-33. Thus, the arbitrator appears to have concluded that he would permit broad questioning of the witnesses on all the issues -- procedural and substantive -- in order to create a full factual record, but that he would permit Matlack to address the merits of the Article 50 argument at a later date.

Again at the close of the day's hearing, the arbitrator appeared to signal to the parties that he would only decide the procedural issues presented that day and that Matlack could address and brief the merits of the dispute at a later date. The following colloquy occurred:

Mr. Peet
[counsel for Matlack]: I would like to brief the issue of the grievance. And I think trying to brief the other issue (inaudible) we may want to come back, depending upon your points on the grievance issue. Based upon your ruling (inaudible), I'd like to brief the case, depending on how you rule and how we see the grievance issue.

. . .

Arbitrator:   I have no objection. As a matter of fact, I was just going to say, Mr. Lehman [Local 312's president], its a little unusual to have a proceeding and then -- and then and my only question really -- my only comment (inaudible) what Mr. Peet had suggested was going to be (inaudible) need not brief it, which is go ahead and issue a ruling on the -- on the scope of the issue. If there was (inaudible) the broader issue for a second day of hearing, I would then go ahead and address the whole shooting

7

match and then brief everything or close
orally.

I have no problem if Mr. Peet wants to
address the scope of the issue individually,
and whether you do it orally or brief form
is up to you. If you want to brief it
(inaudible) I would just ask not to take too
long because of the day of submitting
(inaudible).

Mr. Peet:   I would like to brief.

Mr. Muller [counsel for Local 312]:   I am going to brief
the whole thing,
the whole ball of
wax.

. . .

Arbitrator:   You understand, Mr. Muller, you're going
to exchange briefs and you'll have the
benefit of your brief on that.

App. at 325-327.

Based upon its understanding of the arbitrator's
intentions, Matlack submitted a post-hearing brief that only
addressed the timeliness of the Union's letter of June 1,
1994 and whether the letter's scope extended beyond the
Muscatine loads. Matlack stated in its brief its
understanding that, "In the event the Arbitrator ruled that
the alleged amendment to the grievance was valid, the
Company would have the right to reopen the hearing for the
purposes of further cross-examining the witnesses the
Union presented at the April 27th Hearing, and presenting
new evidence." App. at 49. In the Union's post-hearing
brief, the Union answered all the procedural objections
made by Matlack, and argued that the merits of the dispute
rendered Matlack in violation of Article 50 and also that no
additional hearing was necessary as Matlack never provided
any evidence to rebut the established presumption of
diversion and would thus be estopped from presenting such
evidence in future proceeding. App. at 62-72.

8

On June 13, 1995, Arbitrator Long sent both parties an award that clearly purported to render judgment in favor of the Union on the procedural objections regarding the scope and timeliness of the grievance letter as well as on the merits of the grievance. See App. at 89-99 (opinion, decision, and remedy of Arbitrator Long).3  He decided that the grievance letter was timely filed, that the handwritten amendment to the amendment extended the scope of the grievance to those loads originating in areas other than Muscatine, Iowa, and that Matlack violated Article 50 by diverting Muscatine loads from the Bensalem terminal. He awarded the Union back pay and remanded the matter to the Step 2 grievance procedure for disposition of those disputed shipments other than those from Muscatine.

On June 14, 1995 Matlack wrote to the arbitrator and expressed "great shock" that the arbitrator had rendered a decision on the merits of the grievance since all parties to the hearing had understood that Matlack would have another opportunity to present evidence on that substantive issue. App. at 101. What followed was aflurry of correspondence between Matlack and the Union about the propriety of the scope of the judgment and, ultimately, Arbitrator Long's decision to withdraw as arbitrator. On July 17, 1995, Arbitrator Long sent the parties a letter confirming his withdrawal. Again both parties sent letters disputing what was actually adjudged by the arbitrator and what remained to be decided.

_____

3. In his written award, the arbitrator announced that he would be addressing the following issues:

1. Is the grievance of June 1, 1994, timely filed pursuant to Article 7, section 7.2, of the collective bargaining agreement?

2. Is the amendment of August 9, 1994, timely and, otherwise, valid?

3. If not, is the grievance filed on June 1, 1994, limited solely to the loads of waste water originating in Muscatine, Iowa?

4. If it is determined that the grievance is timelyfiled, has there been a violation of Article 50 of the collective bargaining agreement, as alleged?

App. at 81.

9

Arbitrator Long responded on July 31, 1995 in an attempt to clarify where he believed the case currently stood:

My decision to withdraw from this matter concerned a misunderstanding concerning the procedure to be followed prior to a decision resolving the substantive portion of the issue which is separate and unrelated to that portion of the issue concerning the scope of the grievance. Consistent with the record at the close of the hearing on April 27, 1995, it was my intent to leave the matter in the following posture:

1. a binding decision dated June 13th, 1995 extending the scope of the underlying substantive issue to include the grievance of June 1, 1995 as amended during the step 2 grievance meeting on August 9, 1995.

2. no decision concerning the underlying substantive issue of whether the Employer's conduct violated Article 50, Subcontracting, of the collective bargaining agreement, as alleged.

App. at 110. Based on this letter, Matlack refused to comply with the arbitrator's June 13, 1995 decision and sought the Union's agreement to rehear the matter before a different arbitrator. The Union refused.

**B.**

**District Court Procedure**

On September 7, 1995, Local 312 filed a complaint in the Eastern District of Pennsylvania pursuant to § 301(c) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185 (1995), seeking to enforce the original arbitration award in its entirety including both its procedural and substantive portions. The parties filed cross-motions for summary judgment, submitting correspondence and deposition testimony from Arbitrator Long. Local 312 argued that the June 13, 1995 decision was a final award and, under well established doctrine, was entitled to complete deference by the court. Matlack contended that the July 31, 1995 letter

10

and the arbitrator's withdrawal clearly voided the substantive portion of the award and entitled it to a new arbitration proceeding. Matlack filed the deposition of Arbitrator Long, which contained the following testimony:

BY MR. MULLER [Counsel for the Union]:

Q: Mr. Long, at any time, did you communicate to either Mr. Peet [counsel for Matlack] or myself, either verbally or in writing, that your opinion issued on June 13, 1995, was vacated?

A: No, sir.

See Teamsters 312 v. Matlack, Inc., 916 F. Supp. 482, 484 (E.D. Pa. 1996).

The district court found that "Long's answer at his deposition raised questions in the court's mind about his letter of July 31" and that it was "[f]aced with some uncertainty as to what Arbitrator Long intended after issuing his June 13, 1995 award," and declined to grant summary judgment on the submissions. Id. The court requested that Arbitrator Long testify at an evidentiary hearing, and rejected the Union's objection to the court's decision to call the arbitrator as a witness. Id. at 484-85. After hearing Long's testimony, the district court found that the arbitrator had led Matlack to believe that he would not render a decision on the merits of the dispute and would permit Matlack to address that issue at a later date. Id. at 484. The court concluded that the ultimate award followed from a fundamental procedural irregularity which justified vacating the tainted portion of the award and remanding on the merits. The court ordered that the arbitration award of June 13, 1995 was properly enforceable "as to the timeliness and scope of the grievance only." Id. at 487.

## II.

This case requires us to resolve two legal issues. First, whether the doctrine of functus officio precluded the district court from examining the arbitrator's July 31, 1995 letter which acknowledged a procedural irregularity and clarified the intended scope of the arbitration award. Second, assuming the letter was properly considered, whether the

11

district court had the legal power to vacate a portion of the award that resulted from the procedural irregularity.

## A.

### Functus Officio Doctrine

Local 312 contends that according to the long-standing doctrine of functus officio an arbitrator's power is exhausted immediately after s/he reaches a final decision, regardless of the correctness of that decision. It argues that, therefore, Arbitrator Long's letter purportedly clarifying his decision was a legal nullity and the original award as submitted, resolving both the procedural and substantive issues in the Union's favor, must be final. We conclude, however, that because the arbitrator's letter merely related to the procedural status, and did not attempt to alter the substance of his analysis, the letter was not proscribed by the functus officio doctrine.

The doctrine of functus officio, Latin for a task performed,[4] was applied strictly at common law to prevent an arbitrator from in any way revising, re-examining, or supplementing his award. Glass, Molders, Pottery, Plastics and Allied Workers Int'l Union v. Excelsior Foundry Co., 56 F.3d 844, 846-47 (7th Cir. 1995); Colonial Penn Ins. Co. v. Omaha Indem. Co., 943 F.2d 327, 331 (3d Cir. 1991). The rule provided simply that when "arbitrators have executed their award and declared their decision they are functus officio and have no power or authority to proceed further." Mercury Oil Refining Co. v. Oil Workers Int'l Union, 187 F.2d 980, 983 (10th Cir. 1951).

The policy underlying the common law doctrine derives from a perception that arbitrators, unlike judges, are not institutionally sheltered from "the potential evil of outside communication" and are thus particularly susceptible to

_____

4. Black's explains that the term is "[a]pplied to an officer whose term has expired and who has consequently no further official authority; and also to an instrument, power, agency, etc., which has fulfilled the purpose of its creation, and is therefore of no further virtue or effect." Black's Law Dictionary 673 (6th ed. 1990).

various ex parte influences that might affect a conclusion. La Vale Plaza, Inc. v. R.S. Noonan, Inc., 378 F.2d 569, 572, n.13 (3d Cir. 1967). As the Seventh Circuit stated in Excelsior Foundry, functus officio conceives of arbitrators as "ad hoc judges -- judges for a case; and when the case is over, they cease to be judges and go back to being law professors or businessmen or whatever else they are in private life." 56 F.3d at 847. In the same opinion, the court opined that the functus officio doctrine was motivated primarily by judicial antagonism toward arbitrators and a derogation of the arbitral process -- originating "in the bad old days when judges were hostile to arbitration and ingenious in hamstringing it." Id. at 846; see also Courier-Citizen Co. v. Boston Electrotypers Union No. 11, 702 F.2d 273, 278 (1st Cir. 1983) (recognizing that limitations on arbitrator's post award authority rested on court's hostility toward arbitration as dispute resolution mechanism).

However, after the Supreme Court instructed federal courts to fashion and apply a substantive body of federal labor law in § 301 LMRA enforcement proceedings, see Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 456 (1957), the federal courts have been less strict in applying the common law functus officio rule in reviewing labor disputes. See, e.g., Locals 2222, 2320-2327, Int'l Bhd. of Elec. Workers v. New England Telephone & Telegraph Co., 628 F.2d 644, 647 (1st Cir. 1980) (considered doctrine irrelevant in ordering resubmission of existing arbitration award to original arbitrators for amplification); Enterprise Wheel & Car Corp. v. United Steelworkers, 269 F.2d 327, 332 (4th Cir. 1959) (upholding resubmission of award to arbitrator because original hostility to arbitration process less relevant in labor disputes), aff'd in relevant part, 363 U.S. 593, 599 (1960); see generally, United Steelworkers v. Ideal Cement Co., 762 F.2d 837, 841 n.3 (10th Cir. 1985) (listing cases).

This court considered the continued applicability of the functus officio doctrine in Colonial Penn, a non-labor case in which the district court ruled that an arbitration panel in a reinsurance dispute was permitted to reconvene in order to correct a mistaken assumption of fact. 943 F.2d at 329-30. We acknowledged that the doctrine remains viable,

particularly when the arbitrator is asked to reconsider or amend the merits of an initial award, but listed the doctrine's recognized limitations: "(1) an arbitrator can correct a mistake which is apparent on the face of his award; (2) where the award does not adjudicate an issue which has been submitted, then as to such issue the arbitrator has not exhausted his function and it remains open to him for subsequent determination; and (3) where the award, although seemingly complete, leaves doubt whether the submission has been fully executed, an ambiguity arises which the arbitrator is entitled to clarify." Id. (citing La Vale, 378 F.2d at 573) (internal quotations omitted).

These exceptions from the functus officio doctrine were narrowly drawn to prevent arbitrators from engaging in practices that might encourage them to change their reasoning about a decision, to redirect a distribution of an award, or to change a party's expectations about its rights and liabilities contained in an award. See, e.g. Colonial Penn, 943 F.2d at 332 (emphasizing need to prevent parties from attempting to persuade arbitrators "to overturn an adverse award"). Therefore, whether a case falls within one of these categories must be considered in light of the underlying rationale for the modern application of functus officio.

The exception under category (1) above, which allows an arbitrator to correct a mistake apparent on the face of the award, is designed for cases of clerical mistakes or obvious errors of arithmatic computation. Id. In Colonial Penn we concluded that this exception did not apply to alleged mistakes where extraneous facts must be considered. Id.

The rationale for the exception under category (2) above, which authorizes an arbitrator to decide a remaining issue which has been submitted by the parties but not resolved, is that the arbitration agreement between the parties is still in force and the arbitrator's power over the remainder of the unresolved submission continues. Therefore,"the arbitrator is not exposed to any greater risk of impropriety than would normally exist during the pendency of the arbitration proceedings." La Vale, 378 F.2d at 573.

14

The case before us falls within neither category (1) nor (2). The arbitrator's July 31 letter did not purport to correct any mistakes appearing on the face of the arbitration award nor did the arbitrator leave undecided a particular issue submitted by the parties. If anything, Arbitrator Long decided more than the parties had anticipated, and the rationale for the second exception would not appear to accommodate the inverse factual situation.

The coverage of category (3) above, which entitles an arbitrator to clarify an ambiguity in a "seemingly complete" award where there is "doubt whether the submission has been fully executed," Colonial Penn, 943 F.2d at 332, would not undermine the policy considerations that prohibit arbitrators from re-examining awards "for there is no opportunity for redetermination on the merits of what has already been decided," La Vale, 378 F.2d at 573. The La Vale decision illustrates the situation in which resubmission to an arbitration panel for clarification is permissible. The award had been in favor of a contractor, Noonan, for approximately $31,000. La Vale, 378 F.2d at 570. La Vale subsequently sued Noonan to recover approximately $25,000 because it had delivered Noonan a deposit of approximately $56,000 during the pendency of the proceeding. Noonan contended that the arbitration panel had recognized that the $56,000 represented a partial payment on account and that the $31,000 award was thus meant to be supplemental.

We upheld the district court's resubmission of the issue to the arbitration panel for clarification as to whether the sum of $56,000 was a deposit or a payment on account. Id. at 573. In light of the policies underlying the functus officio doctrine, we concluded that the doctrine would not prevent resubmission because it would "in no way reopen the merits of the controversy." Id.

The decision in La Vale is consistent with the approach followed elsewhere. See, e.g., Courier Citizen, 702 F.2d at 279 (arbitrator allowed to explain remedy sketched out in award, because situation unlike cases where "arbitrator issued a second award fundamentally inconsistent with the first award."); Hanford Atomic Metal Trades Council v. General Elec. Co., 353 F.2d 302, 308 (9th Cir. 1965)

15

(resubmission to arbitrator permissible because "not for the purpose of relitigating or modifying the award"); 42 Pa. C.S.A. § 7315(a)(2) (Pennsylvania Arbitration Act authorizing resubmission where "arbitrators awarded upon a matter not submitted to them and the award may be corrected without affecting the merits of the decision upon the issues submitted.").

In this case, we need not decide whether the circumstances would have justified resubmission to the arbitrator because Arbitrator Long withdrew before the matter was brought to the district court. Therefore, the issue before us concerns the propriety of the district court's consideration of arbitral post-award comment.

In a series of cases from various circuits, the courts have considered supplementary information from the arbitrator that addressed a fundamental procedural irregularity. As the Seventh Circuit stated in Excelsior Foundry, if the functus officio doctrine were to prevent parties from clarifying what they perceive to be a fundamental procedural irregularity "[t]he result would be a gap in the system of arbitral justice that would make very little sense." 56 F.3d at 847 (post award, ex parte communications between union and arbitrator permissible and binding where necessary to complete or clarify an award).

The Eighth Circuit considered a somewhat similar situation in Local P-9, United Food and Commercial Workers Int'l Union v. Hormel & Co., 776 F.2d 1393, 1394 (8th Cir. 1985), where an arbitrator issued an award in favor of the Union but attached a letter offering to meet with the parties if they wished to discuss his decision. After all the parties reconvened, the arbitrator issued an amended award in favor of Hormel. In an action brought by the Union to enforce the original award and vacate the "amended" version, the Company attempted to introduce a post-award affidavit from the arbitrator which stated that he intended the original award to serve only as a non-binding draft. The court of appeals held that, despite the status of the affidavit as a "post-award comment," the district court should have considered the paragraph of the affidavit that stated that the arbitrator had informed the parties at the initial hearing that the first award would be only preliminary and open for

16

reconsideration. Id. at 1395. After considering the policy reasons behind the functus officio rule, the court concluded that the paragraph was admissible because it "does not impeach the initial award or explain the arbitrator's decision-making process, but merely describes the procedural process which the arbitrator allegedly told the parties he would follow." Id. at 1395-96. Accordingly, the court directed the district court to examine that portion of the affidavit as well as "all other evidence -- including the testimony of persons who were present at the initial hearing as to what the arbitrator did or did not say -- to determine whether the award was a preliminary or final one." Id. at 1396.

In Ideal Cement, an arbitrator resolving a labor dispute about an employee's termination mailed a preliminary award to both parties with the suggestion that the parties could submit additional medical information for the arbitrator's review. 762 F.2d at 839. The Union submitted the employee's relevant medical records but provided no copy to Ideal. The arbitrator issued a final award in favor of the Union, but attached a cover letter explaining that he had in fact finalized the award prior to receiving the Union's ex parte communication, and that the information did not influence his judgment. Nevertheless, in order to avoid even the appearance of impropriety, the arbitrator offered Ideal the choice to accept the award or to disqualify the arbitrator and void the award. At Ideal's request, the arbitrator disqualified himself and set aside the award. Id.

The Tenth Circuit affirmed the district court's refusal to enforce the award. The court of appeals described the arbitrator's offer to void his decision as a "procedural event" entitled to heightened deference from federal courts. Id. at 841. The court endorsed the arbitrator's actions, suggesting that "[t]o avoid the appearance of impropriety he chose to utilize a procedural device not unlike the remittitur/new trial alternative offered to an overly-compensated plaintiff." Id.

In this case, Arbitrator Long issued an award that covered matters that he had advised the parties would not be decided without further evidence and briefing, causing a fundamental procedural irregularity. It might have been

17

possible to determine the existence of this irregularity from the tapes of the arbitration hearing without the July 31 letter as they evidence at least some difference between what the parties were told at the time and what the arbitrator did, but the parties agree that the tapes, which were unofficial, were inaudible in parts and incomplete. Under these circumstances, it was not improper for the arbitrator to issue the letter of July 31 clarifying his "misunderstanding concerning the procedure to be followed prior to a decision resolving the substantive portion of the issue" and the basis for disqualifying himself. App. at 110. As in Ideal Cement, this was a procedural device that was not relevant to the merits of the controversy but which "outlin[ed] his procedural decision." 762 F.2d at 842. As the court concluded in that case, "[t]hat the arbitrator chose to use such a procedure to protect the integrity of the arbitration process should not be subject to judicial second guessing." Id. at 841.

**B.**

**Vacation of the Award**

In the posture in which this matter was first presented to the district court by Local 312's suit for enforcement of the arbitration award, the arbitrator had already withdrawn, returned Matlack's arbitration file, and written the July 31 letter which set forth the scope of the award itself. That letter clarifies that there had been two questions presented for arbitration -- the first being the procedural question as to whether the Union's grievance of June 1, 1994 had been timely filed and expanded by the amendment of August 9, 1994 (he decided in favor of the Union's position that it had) -- and the second being the substantive issue as to whether Matlack had violated the collective bargaining agreement (the letter said he had intended to make no decision). This record provided ample basis for the court's ultimate decision to enforce only that portion of the award that all parties agreed had been submitted dealing with the scope of the grievance.

Local 312 objected to the court's decision to call the arbitrator to testify at a hearing as to the procedure the

18

arbitrator had intended to follow. The district court explained that it "simply sought to find out what the arbitrator said at the April 27 arbitration hearing concerning the procedure he intended to follow." Matlack, Inc., 916 F. Supp. at 485. While at least one court has permitted testimony from the arbitrator to clarify the status of an award, see, e.g., Iron Workers Local No. 272 v. Bowen, 624 F.2d 1255, 1264 (5th Cir. 1980) (arbitrator permitted to write post-award letter and testify at trial in order to clarify decision), calling upon the arbitrator to testify as to his or her intentions is questionable in light of the well-established principle that it is not the province of a court to clarify the arbitrator's award. See Colonial Penn, 943 F.3d at 334. Under ordinary circumstances we would not sanction calling an arbitrator to testify, as the written record would suffice to permit the court to rule on enforcement vel non. However, we believe we can decide this appeal without reference to the arbitrator's testimony.

Consistent with the July 31 letter, the district court determined that the arbitrator had indicated to the parties that he would only reach a decision on the timeliness and scope issues and reserve a decision on the merits of the Union's grievance until after Matlack had an opportunity to address that issue. Based on that determination, the court vacated the portion of the arbitrator's award that purported to resolve the merits of the Union's grievance.

We exercise plenary review of the district court's decision resolving cross motions for summary judgment. United Parcel Service, Inc. v. Int'l Bhd. of Teamsters Local No. 430, 55 F.3d 138, 140 (3d Cir. 1995). We conclude that because the record of the arbitration proceedings as well as the arbitrator's July 31 letter confirming the intended scope of the arbitration award established that there was a fundamental procedural irregularity in the arbitration proceeding, the district court had authority to vacate the portion of the arbitrator's award dealing with the substance of the grievance.

Local 312 argues that the district court's decision to vacate the arbitrator's original determination on the merits is inconsistent with the long line of case law firmly establishing the limitations on judicial intervention in

19

arbitration decisions. See, e.g., United Paperworkers Int'l Union v. Misco Inc., 484 U.S. 29, 38 (1987) ("as long as the arbitrator is even arguably construing or applying the contract" the award must be enforced, even if the court is "convinced [that the arbitrator] committed serious error"); News America Publications, Inc. v. Newark Typographical Union, Local 103, 918 F.2d 21, 24 (3d Cir. 1990) ("there must be absolutely no support at all in the record justifying the arbitrator's determinations for a court to deny enforcement of an award").

However, the doctrine severely limiting judicial review of arbitration awards is inapposite here because the district court did not purport to revisit, reinterpret, or overrule the arbitrator's legal or factual analysis. The correctness of the arbitrator's substantive conclusion was not under scrutiny.

At common law, an arbitration award may be set aside where there is an adequate showing of "[f]raud, partiality, misconduct, violation of a specific command of law, or vagueness rendering enforcement impractical, or a showing that enforcement would be contrary to public policy." Local 863 Int'l Bhd. of Teamsters v. Jersey Coast Egg Producers, Inc., 773 F.2d 530, 534 (3d Cir. 1985) (internal citations omitted), cert. denied, 475 U.S. 1085 (1986). In addition, "[p]rocedural irregularities . . . may also result in such fundamental unfairness as to warrant the vacation of an arbitral award." International Bhd. of Elec. Workers, Local Union 1823 v. WGN of Colorado, Inc., 615 F.Supp. 64, 66 (D.Colo. 1985); Robert A. Gorman, Labor Law 600-602 (1976).

Examples of procedural irregularities that have merited district court suspension of arbitration awards are varied. See Textile Workers Union of America v. American Thread Co., 291 F.2d 894, 901 (4th Cir. 1961) (affirming denial of union's enforcement request because arbitrator went outside record and based decision on findings from a different arbitration proceeding); Harvey Aluminum v. United Steelworkers of America, 263 F.Supp. 488 (C.D.Cal. 1967) (arbitration award remanded where arbitrator refused to admit certain evidence in rebuttal without giving parties warning about application of evidentiary rules); Electrical Workers, 615 F.Supp. at 67-68 (vacating arbitration board

20

award and remanding because neutral arbitrator rendered decision without obtaining the signatures of the partisan arbitrators, so that there was a "lack of evidence of any significant decision-making process by the majority of the board").

In this case the parties undertook arbitration pursuant to their collective bargaining agreement, and the Federal Arbitration Act, 9 U.S.C. § 10 (1995), is not binding. Nevertheless, to the extent that the Act imposes constraints on judicial review of arbitration awards similar to those in the labor context, its provisions are instructive here. Section 10(a)(3) of the Act (formerly 10(c)) allows a court to vacate an arbitration award "[w]here the arbitrators were guilty of . . . any . . . misbehavior by which the rights of any party have been prejudiced." Pursuant to this provision, we have held that a court has the power to vacate an arbitration award where an arbitrator receives ex parte information to the prejudice of one of the parties. Mutual Fire, Marine & Inland Ins. Co. v. Norad Reinsurance Co., Ltd., 868 F.2d 52, 56-57 (3d Cir. 1989).

In interpreting another portion of § 10(c) of the Act, we also have allowed a court to vacate an arbitration award if the arbitrator's refusal to hear proffered testimony "so affects the rights of a party that it may be said that he was deprived of a fair hearing." Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co., 397 F.2d 594, 599 (3d Cir), cert. denied, 393 U.S. 954 (1968). Moreover, it has become axiomatic that a district court may vacate an award if a party to an arbitration proceeding has not been given notice and opportunity to present arguments and evidence on the merits of the dispute. Robbins v. Day, 954 F.2d 679, 685 (11th Cir.), cert. denied, 506 U.S. 870 (1992); Konkar Maritime Enters., S.A. v. Compagnie Belge D'Affretement, 668 F.Supp. 267, 271 (S.D.N.Y. 1987) (listing cases).

The National Labor Relations Board has itself imposed minimum due process standards in evaluating the fairness of arbitration proceedings resolving unfair labor practice issues. Spielberg Manufacturing Company, 112 NLRB 1080 (1955). Thus, it has refused to defer to an arbitrator's decision where evidence was deliberately withheld from an arbitrator, Precision Fittings, 141 NLRB 1034, 1041-43

21

(1963), where the grievant was given insufficient time to prepare, Gateway Transp. Co., 137 NLRB 1763, 1764 (1962), or was not afforded an opportunity to cross-examine a witness, Versi Craft Corp., 227 NLRB 877, 887 (1977).

In this case, the record establishes that the arbitrator made a fundamental procedural error in deciding the merits of the controversy after advising the parties that he would not do so until after he decided the procedural issues and until Matlack had an opportunity to present its case on the merits. In the district court's words, the arbitrator simply "told the parties one thing and, albeit mistakenly, did another." Matlack, Inc., 916 F.Supp. at 486. The arbitrator's resolution of the merits of the Union's Article 50 grievance without benefit of Matlack's evidence or argument on the issue severely impeded Matlack's right to notice and opportunity to be heard in such an adversarial proceeding. See Konkar Maritime Enters., 668 F.Supp. at 271. This is precisely the type of procedural error that "undermine[s] the validity of the arbitration process," Gorman, Labor Law 602, permits an arbitrator to take remedial measures such as withdrawal, and authorizes a district court to vacate and remand an arbitration award.

## III.

We conclude that the functus officio doctrine did not proscribe the district court from examining the arbitrator's post award letter which purported to clarify the intended scope of the award, and that the arbitrator's award was partially the product of a fundamental procedural irregularity. Accordingly, we will affirm the district court's decision to vacate the substantive portion of the award and to remand the remainder of the proceedings to another arbitrator.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

22