OPINION
BARRY, Circuit Judge.
Chemoil Corporation (“Chemoil”) and Andorra Services, Inc. BVI (“Andorra”) (collectively “Appellants”) appeal the final judgment of the District Court confirming an arbitrator’s award in favor of Venfleet, *624 Ltd. (“Venfleet”) and M/V EOS (“EOS”) (collectively “Appellees”) and denying Appellants’ motion to vacate that award. We will affirm.
I. BACKGROUND
We assume the parties’ familiarity with the facts, and include only those facts necessary to resolve the issues on appeal. Chemoil, a purchaser and seller of petroleum products in the global marketplace, directed Andorra, its affiliate, to arrange for the shipment of fuel oil from Amuay Bay, Venezuela to Chemoil’s facility in Bayonne, New Jersey. Andorra chartered EOS, an oil tanker owned by Venfleet. Ultimately, it was the water content of the fuel oil that led to this litigation and arbitration.
The EOS arrived at the PDVSA[1] Terminal in Amuay Bay on December 25, 2005, and, after a short delay, the fuel oil was loaded onto the tanker from shore tank 801. Tank 801, which serves as a storage tank for fuel oil, is described as an “open pit” having no overhead protection from the elements. (App. at 84.) Once the fuel oil was loaded, it was to be kept at the appropriate temperature by heating coils. In this case, however, Venfleet “fail[ed] to properly pressure test and inspect the cargo heating coils ... [and] Venfleet concedes the coils were defective and leaked water into the cargo from the moment heating commenced until the vessel arrived in New York.” (Id. at 102.)
Discharge of the fuel oil began upon the EOS’s arrival in the Port of New York on January 6, 2006. Shortly thereafter, however, Chemoil halted the operations, claiming it was motivated by test results revealing that the water content of the cargo was between 1.7% and 1.8% when it should have been no greater than 1%. The EOS drifted for roughly twenty days while several joint inspections took place. Ultimately, discharge resumed and was completed on January 29.
II. PROCEDURAL HISTORY
Appellants filed a Verified Complaint in the U.S. District Court for the District of New Jersey on January 26, 2006, seeking damages for cargo contamination. The parties eventually agreed to arbitrate, selecting Jack Berg as the sole arbitrator. At that point, Appellants sought $471,435.81 in damages allegedly the result of EOS’s leaking heating coils, the EOS’s unseaworthiness, and other faults. For their part, Appellees sought to recover $1,190,112.54, representing the costs associated with demurrage and other expenses. The parties also sought interest and attorneys’ fees.
Arbitration took place over a period of twenty-one months, during which there was “extensive discovery and production of relevant documents,” as well as testimony from several witnesses; however, both sides were dissatisfied with certain aspects of the discovery. (Id. at 92.) In seeking to ascertain the water content of the fuel oil at the time it was loaded onto the EOS at Amuay Bay, the arbitrator made a comprehensive assessment of a variety of evidence, including, for example, the moisture percentage of the fuel oil loaded out of pit 801 onto another tanker just prior to the EOS’s loading, the difference in the EOS’s cargo tank ullages between when the EOS left Venezuela and arrived in New Jersey, and the “limited quantity of fresh water the ship could have generated or have in tanks to possibly increase the water content of the fuel oil....” (Id. at 98.) Based *625 on the evidence he found credible, and declining to draw adverse inferences from the evidence he did not, the arbitrator determined that the EOS’s malfunctioning heating coils could not have contributed more than 0.4% of water to the ship’s load and, thus, that the fuel oil had a water content between 1.4% and 1.5% at the time it was loaded onto the tanker from pit 801. Accordingly, the arbitrator found in favor of Appellees, finding no evidence to support Appellants’ rationale for forcing the EOS to remain at sea for twenty days prior to discharging the fuel oil.
By order dated November 19, 2008, the District Court granted Appellees’ motion to confirm the arbitrator’s award and denied Appellants’ cross-motion to vacate or modify that award, pursuant to the Federal Arbitration Act (the “FAA”), 9 U.S.C. §§ 1-11. On November 25, 2008, the Court entered final judgment for Appellees in the amount of $1,986,882.67, plus interest and costs. This appeal followed.[2]
III. STANDARD OF REVIEW
“We review a district court’s denial of a motion to vacate a commercial arbitration award de novo.” Dluhos v. Strasberg, 321 F.3d 365, 369 (3d Cir.2003); Kaplan v. First Options, 19 F.3d 1503, 1509 (3d Cir.1994).[3] In so doing, we are mindful that the FAA was intended to overcome the “hostility of American courts to the enforcement of arbitration agreements.” Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 111, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001). Indeed, there is a “strong presumption ... in favor of enforcing arbitration awards” embodied in the FAA. Brentwood Med. Assocs. v. United Mine Workers, 396 F.3d 237, 241 (3d Cir.2005). When parties agree to arbitrate, they agree to do so “through to completion,” fully cognizant that “a district court may vacate ... only under exceedingly narrow circumstances.” Dluhos, 321 F.3d at 369-70; Citgo Asphalt Ref. Co. v. Paper, Allied-Indus. Int’l Union, Local 2-991, 385 F.3d 809, 815 (3d Cir.2004) (noting court’s limited role in reviewing arbitrator’s decision because the decision is “bargained for by the parties”). As a result, reviewing courts “affirm easily the arbitration award under this extremely deferential standard—a result that is squarely in line with the purpose behind the FAA where courts are tasked with reviewing an arbitration decision.” Dluhos, 321 F.3d at 370; see Brentwood Med. Assocs., 396 F.3d at 241.
IV. DISCUSSION
Appellants contend that, for various reasons, the arbitrator’s award should be vacated, or, in the alternative, modified. We disagree.[4]
A. VACATUR
Pursuant to the FAA, courts may vacate an arbitration award in any of four instances, two of which are implicated here: where there was “evident partiality or corruption in the arbitrators,” or “where the arbitrators were guilty of misconduct in *626 refusing to postpone the hearing ... or in refusing to hear evidence pertinent and material to the controversy....” 9 U.S.C. § 10(a); Hall Street Assocs. v. Mattel, Inc., 552 U.S. 576, 128 S.Ct. 1396, 1402, n. 4, 170 L.Ed.2d 254 (2008). Appellants argue that these provisions, as well as public policy concerns, justify vacating the arbitrator’s award in this case.

1. The Arbitrator’s Conduct Neither Created the Appearance of Bias Nor Violated Fundamental Fairness in Contravention of 9 U.S.C. § 10(a)(2)-(3).

In order to set aside an arbitrator’s award on the ground of § 10(a)(2) “evident partiality,” “the challenging party must show ‘a reasonable person would have to conclude that the arbitrator was partial’ to the other party to the arbitration.” Kaplan v. First Options of Chi., Inc., 19 F.3d 1503, 1523 n. 30 (3d Cir.1994) (quoting Apperson v. Fleet Carrier Corp., 879 F.2d 1344, 1358 (6th Cir.1989)). Under this standard, the evidence must be “powerfully suggestive of bias.” Id. (quoting Merit Ins. Co. v. Leatherby Ins. Co., 714 F.2d 673, 681-82 (7th Cir.1983)). Bias in refusing to consider certain evidence could result in an unfair hearing, and so, pursuant to § 10(a)(3), “a district court may vacate an award if a party to an arbitration proceeding has not been given notice and opportunity to present arguments and evidence on the merits of the dispute.” Teamsters Local 312 v. Matlack, Inc., 118 F.3d 985, 995 (3d Cir.1997) (emphasis added). Of course, vacatur is not required in every case where certain relevant evidence is excluded; rather, § 10(a)(3) is implicated where the procedural error constitutes “fundamental unfairness.” Id.
Appellants argue that the arbitrator demonstrated his bias by failing to ensure that relevant documentary evidence was disclosed in a timely manner. More specifically, they argue that they were prejudiced by the arbitrator’s refusal to order the production of documents related to the EOS’s SAAB radar system, “which records the level of liquids in the cargo control room.” (App. at 84.) Appellants contend that they first learned that the EOS was equipped with SAAB technology on the eve of their expert’s testimony. They maintain that the SAAB radar’s “sophisticated electronic liquid cargo measuring system” would have provided valuable insight into the water content of the fuel oil at various points during the journey from Amuay Bay to New Jersey. (Appellants’ Br. at 37.) For their part, Appellees contend that the SAAB radar is “not used for cargo measurements” while tankers are at sea, Appellees’ Br. at 14-15, but, instead, measurements are taken by the EOS’s gauges when the ship is “relatively static,” Supp. App. at 19.
There is no evidence to suggest that the arbitrator’s refusal to delay the proceedings and order the production of this evidence was motivated by bias, nor is there any indication that it resulted in a fundamentally unfair proceeding. It is clear from the arbitrator’s written decision that he was aware of the SAAB radar system, and despite Appellants’ contentions, he found that the “remote SAAB gauges, trim and list gauges, digital draft readings, etc. are available for readouts by all inspectors and surveyors.” (App. at 84.) Ultimately, whether Appellants were on notice of the SAAB radar system so that they could request its data is immaterial, because the arbitrator did not find the system important to his decision. He viewed the SAAB system as being one of two “closed cargo measurement systems,” the other being the MMC equipment. (Id.) Based on his expertise, the arbitrator made a judgment as to the cargo’s water content after considering a variety of factors, one of which was “the difference in the EOS’ cargo tank *627 ullages between loading Amuay Bay and arrival at Bayonne.” (Id. at 98.) That the arbitrator relied on the inspection reports from Amuay Bay and Bayonne—in conjunction with other evidence the result of the extensive discovery in this case—instead of the SAAB radar system to come to his conclusion about water content is not “powerfully suggestive of bias.” See Kaplan, 19 F.3d at 1523, n. 30. Furthermore, the arbitrator’s evidentiary rulings concerning the SAAB equipment did not “so a£fect[] the rights of [appellants] that it may be said that [they were] deprived of a fair hearing.” See Teamsters Local 312, 118 F.3d at 995. The District Court was justified in rejecting Appellants’ argument that § 10(a) of the FAA required that the arbitrator’s award be vacated.

2. The Arbitrator Did Not Impose An Improper Burden on Appellants Such that Vacatur is Required.

Appellants next argue that the District Court erred in denying the motion to vacate because the arbitrator “manifestly disregarded the law” in reaching his decision. (Appellants’ Br. at 39.) .That an arbitrator’s manifest disregard of the law may support a decision to vacate an arbitration award is not a new concept. See, e.g., Tanoma Mining Co., Inc. v. Local Union No. 1269, 896 F.2d 745, 749 (3d Cir.1990); Local 863 Int’l Bhd. of Teamsters v. Jersey Coast Egg Producers, Inc., 773 F.2d 530, 533 (3d Cir.1985). Whether this concept continues to exist today as an independent, viable ground for vacatur,[5] an issue we need not decide, this case does not evidence one of those “extremely narrow circumstances” supporting a decision to vacate. Metromedia Energy, Inc. v. Enserch Energy Servs., Inc., 409 F.3d 574, 578 (3d Cir.2005) (narrow ground supporting vacatur exists “where an arbitration panel manifestly disregards, rather than merely erroneously interprets, the law”).
Appellants complain, in particular, of the arbitrator’s consideration of unauthenticated evidence, which he then found sufficient to support Appellees’ claim that the cargo had inherent defects. The result, they argue, was that an unduly heavy burden was shifted to them “to show by a preponderance of the evidence the water content of the cargo when loaded and during discharge----” (Appellants’ Br. at 46.) The arbitrator made a choice to credit some pieces of evidence more than others. Appellants submitted cargo test results showing the fuel oil’s water content to be 0.7% at loading. They also presented evidence of a “retained sample,” which showed a 0.8% water content at loading. Nonetheless, the arbitrator expressed concern that, among other things, the samples were “improperly drawn.” He found that the contrary evidence undermining those figures was “substantial and controlling.” (App. at 100.) Thus, the arbitrator did not manifestly disregard the law in setting out burdens but, rather, made a *628 factual determination that the weight of the evidence supported one theory of water content over another, and carefully explained his reasoning. As such, this is not “the rarest case” compelling us to vacate. Newark Morning Ledger Co. v. Newark Typographical Union Local 103, 797 F.2d 162, 165 (3d Cir.1986); see Major League Umpires Ass’n v. Am. League of Prof'l Baseball Clubs, 357 F.3d 272, 289 (3d Cir.2004) (quoting Remmey v. PaineWebber, Inc., 32 F.3d 143, 146 (4th Cir.1994)) (“Limited judicial review is necessary to encourage the use of arbitration as an alternative to formal litigation.... A policy favoring arbitration would mean little, of course, if arbitration were merely the prologue to prolonged litigation”).[6]
B. MODIFICATION
The FAA also empowers courts to modify an arbitration award in any of the following instances: “[wjhere there was an evident material miscalculation of figures ...”; [wjhere the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted; and “[wjhere the award is imperfect in matter of form.... ” 9 U.S.C. § ll(a)-(c). Any modification is entirely discretionary and should “promote justice between the parties.” Id. (“[Tjhe United States court in and for the district wherein the award was made may make an award modifying or correcting the award ....”) (emphasis added); see Hall Street, 552 U.S. 576, 128 S.Ct. at 1403.

1. The Arbitrator Did Not Exceed His Authority by Awarding Pre- and Postr-Judgment Interest.

Appellants argue that the arbitrator lacked the authority to award Appellees pre-and post-judgment interest and that, in any event, the interest rates that he imposed were in excess of what 28 U.S.C. § 1961 permits. At the center of their claim is the argument that because the parties agreed to arbitrate without any prior agreement as to interest, they “had every reason to believe ... the District Court would determine any award.” (Appellants’ Br. at 51.) We disagree. As the arbitrator’s decision indicates, “[bjoth parties have demanded interest on their respective claims.” (App. at 108). Because the parties agreed to submit the dispute to an arbitrator, the arbitrator had the authority to see the matter “through to completion.” Dluhos, 321 F.3d at 369-70. There is simply no basis for believing that the arbitrator was to handle only certain matters, while leaving related pieces of the overall dispute for the District Court to resolve. Furthermore, Appellants offer nothing to square their argument that 28 U.S.C. § 1961 requires an interest rate different from that imposed by the arbitrator with the language in Sun Ship, Inc. v. Matson Navigation Co., which states that the interest rate is “a matter of district court discretion ... guided by 28 U.S.C. § 1961.” 785 F.2d 59, 63 (3d Cir.1986). *629 And, we note, the arbitrator explained the basis for the interest rates he imposed, namely “the average prime interest rate” during the relevant periods. (App. at 108.)[7]

2. The Arbitrator Did Not Err in Aivarding Attorneys’ Fees.

Appellants argue that the arbitrator erred in awarding attorneys’ fees to Appellees because such an award was outside the scope of the arbitration, although they concede that they requested attorneys’ fees for themselves. The District Court upheld the award of attorneys’ fees because that award “dr[ew] its essence” from the parties’ decision to arbitrate; furthermore, the Court did not find the award to be “completely irrational.” {Id. at 9.) No serious argument compels us to alter Shat determination.
CONCLUSION
We will affirm the final judgment of the District Court.

. PDVSA, or Petróleos de Venezuela, is the Venezuelan national oil company that supplied the fuel oil that was loaded onto the EOS.

. The matter was properly before the District Court pursuant to 28 U.S.C. §§ 1333 and 1391. We have appellate jurisdiction under 28 U.S.C. § 1291.

.One of Appellants’ contentions is that the award exceeded the scope of the arbitrator’s authority because he determined that Chemoil and Andorra were alter egos and jointly liable without having heard any argument on the issue. There was no argument because, as the District Court noted, Appellants never raised this issue to the arbitrator.

. The District Court did not consider "manifest disregard for law" as a basis for vacatur given its understanding that the Supreme Court's decision in Hall Street stands for the proposition that the FAA provides the only grounds for vacatur. Our sister circuits have expressed varying views on the impact of Hall Street. Compare Telenor Mobile Commc’ns AS v. Storm LLC, 584 F.3d 396, 407 n. 6 (2d Cir.2009) ("[W]e [previously] read Hall St. to hold that the FAA set forth the ‘exclusive’ grounds for vacating an arbitration award, and that the term 'manifest disregard' was merely a judicial gloss' on some of those grounds.”), with Citigroup Global Mkts., Inc. v. Bacon, 562 F.3d 349, 355 (5th Cir.2009) (“[T]o the extent that manifest disregard of the law constitutes a nonstatutory ground for vacatur, it is no longer a basis for vacating awards under the FAA.”).

. Assuming without deciding that, post -Hall Street, "[ajrbitration awards ... can be vacated when such awards violate public policy,” United. Transp. Union Local 1589 v. Suburban Transit Corp., 51 F.3d 376, 381 (3d Cir.1995), there was no such violation here. Appellants contend that vacatur is appropriate because Appellees’ actions allegedly ran afoul of two public interests, namely environmental protection and the safety/seaworthiness of vesseis. Although the arbitrator found the EOS to be unseaworthy because of its defective heating coils, Appellants did not show that the leaking coils posed environmental or safety risks beyond damaging the cargo, much less that upholding this award "would thwart achievement of the overriding interest in public safety furthered by the [laws and] regulations.” Exxon Shipping Co. v. Exxon Seamen's Union, 993 F.2d 357, 364 (3d Cir.1993).

. The arbitrator found that the EOS should have been discharged without delay, and further noted that, while the delay cost Venfleet, "Chemoil profited enormously ... due to the appreciation of fuel oil values during the period for which demurrage is being claimed.” (App. at 107.) The arbitrator awarded Venfleet interest on the more than nine-month delay in receiving payment after hearing "no rational explanation” from Appellants for that delay. We reject without further comment Appellants' claim that the delayed payment was neither in dispute nor was an issue before the arbitrator.