**F I L E D**
United States Court of Appeals
Tenth Circuit

**AUG 5 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

KENNECOTT UTAH COPPER
CORPORATION,

        Plaintiff-Counter-
        Defendant - Appellant,

v.

GEORGE BECKER; WAYNE
HOLLAND, JR.; DISTRICT 38
UNITED STEELWORKERS OF
AMERICA; JACK GOLDEN;
DALLAS ALEXANDER; GREG
POLLOCK; LOCAL 485 UNITED
STEEL WORKERS OF AMERICA,

        Defendants-Appellees,

UNITED STEELWORKERS OF
AMERICA AFL-CIO-CLC,

        Defendant-Counter-
        Claimant - Appellee.

No. 98-4045

Appeal from the United States District Court
for the District of Utah
(D.C. No. 97-CV-410)

Raymond M. Deeny, of Sherman & Howard L.L.C. (Emily F. Keimig with him on
the briefs), Colorado Springs, Colorado, for Plaintiff-Appellant.

Daniel M. Kovalik, Assistant General Counsel, (Rudolph L. Milasich, Jr., Assistant General Counsel, with him on the briefs), United Steelworkers of America, AFL-CIO-CLC, Pittsburgh, Pennsylvania, for Appellees.

---

Before **BRISCOE, BARRETT,** and **MURPHY,** Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

In this appeal, Kennecott Utah Copper Corporation seeks to overcome one of the most demanding standards in American law: that defining when a court may vacate a labor-arbitration award. Kennecott appeals the district court's refusal to do so. The arbitrator issued an award upholding a grievance which challenged a Kennecott rule that employees must report 20 minutes before their shift to be transported to their work sites. After the arbitrator had issued the award, a union representative contacted him *ex parte*. The arbitrator then sent the parties a letter for the stated purpose of clarifying the award. Kennecott insists that the letter was not a clarification, but a second award.

Kennecott attacks the arbitrator's decision on four grounds: the grievance was untimely; the award on the merits nullified and added to the contract's plain language; the arbitrator was *functus officio*, i.e., without further authority, after issuing the first award and could not issue a new one; and, even if the letter came within the clarification exception to the *functus officio* rule, the *ex parte* contacts invalidate it. This court has jurisdiction under 28 U.S.C. § 1291 and **AFFIRMS**.

-2-

I.     FACTS AND PROCEEDINGS

A.     The Agreements

Kennecott and the Union were parties to two collective bargaining agreements (CBAs). One was a multi-site master agreement (MA), and the other a site-specific supplemental agreement (SA). These CBAs ran from 1993 to 1996. The parties concur that the SA controls in case of any conflict or inconsistency, and that the CBAs required workers to grieve disputes within fifteen days of the incident at issue.

Two clauses, one from the MA and one from the SA, govern the merits. They provide in general that Kennecott will not pay for travel time to work sites; that company-provided transportation to the sites will leave 15 minutes before shifts start; and that, when employees report and work before their shifts, Kennecott will pay them 20 minutes at a rate and a half. In particular, Article 11.E of the MA says that

1.  All employees will be at their work station and ready for work at the start of their scheduled shift. . . . Time used in . . . travel to and from the work station . . . will not be considered as time worked and will not be compensated . . . .
2.  The Company will [transport] employees to their . . . work locations . . . . Transportation will leave designated points at fifteen (15) minutes prior to shift starting time to deliver employees to their work locations to relieve employees on shift. Employees transported back . . . will receive pay for all time spent traveling in excess of fifteen (15) minutes after shift ending time . . . .

The SA says that, "[i]n compensation for extended average work time . . . employees designated by the Company who report and work prior to shift will be paid 20 minutes at a rate and one half for each regularly scheduled work shift."

Under prior CBAs, Kennecott paid for travel time to and from worksites. The 1986 CBA eliminated pay for travel *to*, but kept it for travel *from*, worksites. In the 1990 negotiations, Kennecott refused to resume pay for travel to the worksite. As a compromise, it agreed to pay for the "variety of preparatory work requirements" that precede a shift. Workers from the oncoming shift perform those tasks before their shift begins so that they can replace the prior shift without halting production.

B.    The Dispute

After 1990, the arbitrator found, Kennecott sporadically announced that employees must board vans 20 minutes before their shifts. Each time, employees would protest, and the company would withdraw or not enforce the rule. In summer 1994, however, the company disciplined an employee for not boarding a van 20 minutes before his shift. This was the first instance of such discipline.

The union then filed a grievance. It noted, as Kennecott stresses, that the "off and on" announcements of a 20-minute departure-time rule "ha[d] been going on for four years, 1 month and 3 days." The grievance requested back-pay for 4 years' worth of the 5-minute increments by which Kennecott had required

-4-

employees to report early for transportation. The parties ultimately asked arbitrator Garth Mangum to decide (1) whether the union had timely filed the grievance, and (2) if so, whether Kennecott was violating the CBA "by paying employees time and one-half for 20 minutes and requiring employees to [board] vans at 20 minutes before the shift starting hour? If so, what is the remedy?"

While the parties awaited a chance to argue the grievance before an arbitrator, they negotiated and signed new CBAs, which took effect in late 1996. The new CBAs are not in the record, but the parties seem to agree that they include provisions identical to the disputed ones from the 1993 agreements.

C.    The Award

The parties argued the grievance before Mangum in early 1997, and he issued a written decision on May 5, 1997. He found the grievance timely. On the merits, he ruled that the CBA barred Kennecott from requiring employees to board vans more than 15 minutes before a shift. He reasoned that the MA's "Transportation will leave . . . 15 minutes prior to shift" language was controlling, because nothing in the SA "specif[ies] that [it] in any way modifies, replaces, or supersedes" that clause. He then addressed the SA's provision that "employees . . . who report and work prior to the shift will be paid 20 minutes." That passage, he noted, cannot be read to provide travel pay, as all parties concurred that Kennecott had never agreed to reinstate such pay. Mangum

-5-

concluded, however, that the SA does "compensate the employees for showing up for transportation to and beginning of activities long enough before the start of each shift" to avoid halting production. He further concluded that the provision does not, by mandating compensation of "20 minutes[']" pay, affect the question how many minutes before a shift Kennecott may require employees to report for transportation to work sites:

> [The SA] does not specify any time of transportation departure as a requirement for receipt of the added compensation. Why 20 minutes time and one-half compensation, rather than 15 minutes or some other pay period was chosen, is undoubtedly lost among the compromises inherent in bargaining.

Mangum held that the two clauses are not inconsistent and that the parties must adhere to both until they expired or the parties agreed to change them. "Requiring departure from designated reporting points prior to 15 minutes before shift starting times," he concluded, "is a violation of the [CBA]." He ordered as a remedy that "[a]ny employees penalized by such requirement are to be made whole immediately." In explaining what he meant by making employees whole, he noted only his "understanding that only warning notices have been thus far issued," and ordered Kennecott to rescind any such warnings.

D.     The *Ex Parte* Contacts and the Clarification Letter

Soon thereafter, a union representative named Holland phoned Mangum *ex parte*, either asking him or leaving a message asking him to include Holland in

any phone conversation initiated by Kennecott. Holland then suggested to Kennecott that the parties ask Mangum to clarify whether he had meant to award backpay; Kennecott declined. Holland then sent Mangum an *ex parte* letter on May 12 seeking clarification on four points. He then "outlined" the four points, in his words, or, in Kennecott's view, argued them. Holland devoted the longest, most argumentative passage of his letter to explaining why the union believed that the award had included backpay, and urging Mangum to clarify that it had.

Mangum thought Holland's request for clarification had been bilateral. Without contacting Kennecott, he responded on May 13 with a letter to both parties. "Upon rereading my decision," his letter began, "I can see the possibilities for misinterpretation and hereby clarify that decision." After briefly summarizing his timeliness and merits rulings, he devoted a long paragraph to explaining why he had not meant to award backpay. He then reiterated that "[b]oth the [MA] and the [SA] provisions in question are valid and must be obeyed. Management is to cease and desist its efforts to substitute any other practice for the duration of this agreement."

E.    Proceedings in District Court

Kennecott filed a complaint in the District of Utah seeking an order vacating the award; the Union counterclaimed, seeking an order enforcing the

award. District Judge Campbell resolved the case by ruling orally after hearing argument on cross-motions for summary judgment.

The court readily concluded that the award drew its essence from the CBA: "[t]he bulk of Kennecott's arguments [comprise] simply an attempt to reargue the merits." The court held that the arbitrator had not made any "second award," because the May 13 letter was "either a clarification or a [completion of] the May 5th award." The court also found no affirmative misconduct by Mangum, and no evidence that the undisputedly *ex parte* contacts had harmed Kennecott. Finally, the court held that the arbitrator had jurisdiction to decide the timeliness dispute, and upheld his resolution. After orally explaining her reasoning at some length, Judge Campbell issued a brief written order granting summary judgment, which incorporated by reference her oral ruling.

II.   DISCUSSION

A.   Mootness

The CBAs under which this dispute arose expired in 1996, and the arbitrator's award specified that the clause which he found controlling "will continue in force until either expired or bilaterally changed." That clause had already expired, along with the rest of the CBA, when the arbitrator issued his award in 1997. The award nonetheless quoted and referred only to the expired 1993 CBAs, not the corresponding clauses in the extant 1996 CBAs. The parties

attached only the expired 1993 agreements to their filings in district court and, with two brief exceptions, referred only to those agreements in their arguments to that court and on appeal.[1]

This dispute nonetheless remains live, and satisfies the "case or controversy" requirement of Article III. Part of the remedy ordered was that "[a]ny employees penalized by such requirement are to be made whole" by Kennecott's rescinding any warning notices for failure to report for transportation over 15 minutes before a shift. That provision for retrospective relief in the original award plainly saves the disputes regarding the original award's validity from mootness.

The clarification letter did not affect that retrospective part of the award. Because it clarified and/or completed the award's provision of prospective relief, however, the disputes about its validity also remain live. The validity of the award's prospective provisions will significantly affect, as a practical matter, the parties' ongoing bargaining relationship. The core question in mootness inquiry is whether "granting a present determination of the issues offered . . . will have

---

[1]The only reference to the 1996 agreements apparent in the several-hundred-page record is the Union's assertion in its counterclaim that it and Kennecott are parties to a CBA which succeeded the 1993 CBA and took effect in October 1996. The Union noted only that the 1996 Agreement made final and binding an arbitrator's decision rendered pursuant to it. Kennecott admitted without elaboration these terse allegations.

some effect in the real world." 13A Charles A. Wright et al., *Federal Practice &*

*Procedure* § 3533.1, at 226 (2d ed. 1984); *see, e.g.*, *New Mexico Env't Dep't v.*

*Foulston (In re L.F. Jennings Oil Co.)*, 4 F.3d 887, 889 (10th Cir. 1993) (finding

case moot because resolution "would have no practical significance"). In cases

arising from collective-bargaining relationships, courts have been aggressive in

determining that a dispute remains live because the disputed issue continues to

shape the parties' periodic bargaining or day-to-day interaction. *See, e.g.*,

*Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Ass'n*, 457

U.S. 702, 704 n.1 (1982); *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115,

121–25 (1974); *International Bhd. of Teamsters v. Southwest Airlines Co.*, 875

F.2d 1129, 1132–33 (5th Cir. 1989) (*en banc*) (discussing courts' readiness to

find, in labor cases involving "lapsed contracts," that dispute affects ongoing

relations). In this case, as noted above, clauses in the current CBA recapitulate

*verbatim* the clauses in the 1993 CBA interpreted by the award. An order

enforcing the award, and the award itself, will thus at a minimum have persuasive

value and practical effect in any future dispute about those clauses.[2]

---

[2]Because this court concludes that the *practical* effect of the award's prospective provisions saves from mootness those parts of the controversy concerning the clarification letter, it is unnecessary to determine what binding *legal* effect, if any, the prospective relief in the arbitrator's interpretation of the 1993 CBA has under the current or future CBAs.

B.     Standards of Review

This court reviews a summary judgment in a labor-arbitration case *de novo*. Judicial review of labor-arbitration awards, however, "is among the narrowest known to the law." *Champion Boxed Beef v. Local No. 7*, 24 F.3d 86, 87 (10th Cir. 1994). "The arbitrator's factual findings are beyond review, and, so long as the arbitrator does not ignore the plain language of the [CBA], so is his interpretation of the contract." *Id.* "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987).

C.     Timeliness

1.     *Standard of Review*

It is less clear, however, what standard governs review of the arbitrator's ruling on timeliness. This court's precedents are in tension on that issue. We need not resolve the tension in this case, however, because Kennecott has waived any right to less deferential review of the arbitrator's decision on timeliness by agreeing to submit that issue to the arbitrator.

Urging this court to review the timeliness ruling nondeferentially, Kennecott quotes our holding in *Barnard v. Commercial Carriers, Inc.* that the

timeliness of a grievance was a "jurisdictional requirement" under the CBA at issue. 863 F.2d 694, 698 (10th Cir. 1988); *cf. id.* at 699–700 (Seymour, J., concurring) (declining to join "jurisdictional requirement" holding). The *Barnard* majority did not specify the effect of the time limit's "jurisdictional" status on the standard of review, but its review of the arbitrator's resolution of that issue was not consistent with the very deferential standard for review of an award's merits. *See id.* at 697–98. In a pre-*Barnard* opinion, however, this court held that "federal courts are to give even greater deference to an arbitrator's decision on matters of procedure . . . . The Supreme Court has stated quite plainly that matters of procedure lie solely within the discretion of the arbitrator." *United Steelworkers of America v. Ideal Cement Co.*, 762 F.2d 837, 841 (10th Cir. 1985) (citing *John Wiley & Sons v. Livingston*, 376 U.S. 543, 557 (1964)). Two months later, we held that a dispute over a clear failure to comply with a strictly worded time limit in a grievance clause was arbitrable. *See Denhardt v. Trailways, Inc.*, 767 F.2d 687, 688–89 (10th Cir. 1985) (holding that time-limit provision is "for the arbitrator alone to apply").

This case does not require this court to determine whether *Barnard* created an exception to the established rule of *Ideal Cement* and *Denhardt*, or whether it was a subsequent deviation from that established rule, and thus created an intra-circuit conflict. *Cf. Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*, 175

-12-

F.3d 1221, 1240 (10th Cir. 1999) (discussing such conflicts). Even if *Barnard* did create an exception to the *Wiley* rule, this case does not fall within that exception. The grievance in *Barnard* concerned seniority dates, and the CBA specified that such dates, unless timely challenged, "'shall be deemed correct.'" 863 F.3d at 698. The CBA in this case does not specify the consequences of filing a grievance late. More importantly, the employee who was harmed by the untimely grievance in *Barnard* had never agreed to submit the question of timeliness to an arbitrator instead of a court. *See id.* That employee, indeed, had not even known of the grievance, which was filed by another employee. *See id.* Kennecott, by contrast, expressly agreed to submit to arbitration the timeliness dispute in this case, and argued its position to the arbitrator. Several circuits have held that, if a party submits a question of procedural arbitrability to an arbitrator, a court will not later review the issue *de novo*, but will instead defer to the arbitrator's resolution in the same way it defers to his or her ruling on the merits. *See, e.g.*, *Interstate Brands Corp. v. Chauffeurs, Teamsters, Warehousemen & Helpers Local U. No. 133*, 909 F.2d 885, 890 (6th Cir. 1990); *George Day Constr. Co. v. United Bhd. of Carpenters & Joiners*, 722 F.2d 1471, 1476 (9th Cir. 1984); *United Steelworkers of Am. v. American Smelting & Refining Corp.*, 648 F.2d 863, 866–67 (3rd Cir. 1981). The Supreme Court recently set such a rule in a

commercial-arbitration case. *See First Options of Chicago, Inc. v. Kaplan*, 514

U.S. 938 (1995). A unanimous Court found it "fairly simple" to conclude that

> [j]ust as the arbitrability of the merits of a dispute depends upon
> whether the parties agreed to arbitrate that dispute, so the question
> 'who has the primary power to decide arbitrability' turns upon what
> the parties agreed about that matter. Did the parties agree to submit
> the arbitrability question itself to arbitration? If so, then the court's
> standard for reviewing the arbitrator's decision about that matter
> should not differ from the standard courts apply when they review
> any other matter that parties have agreed to arbitrate.

*Id.* at 943.[3]

This court readily concludes that such a rule should govern review of labor-

arbitration awards. Even assuming timeliness was a jurisdictional issue in this

case, Kennecott waived any right to *de novo* judicial review of that issue by

voluntarily submitting it to arbitration. Accordingly, as in our review of an

award's merits, we will accept without review the arbitrator's factual findings

bearing on timeliness. *See Champion Boxed Beef*, 24 F.3d at 87. We will review

his ruling on timeliness to determine whether, in deciding that issue, he was

"'even arguably construing or applying the contract.'" *International Bhd. of Elec.*

*Wkrs., Local U. No. 611 v. Public Serv. Co. of N.M.*, 980 F.2d 616, 618–19 (10th

---

[3]The Court was interpreting the Federal Arbitration Act, 9 U.S.C. § 1–16, but there is no apparent reason why its conclusion should not apply equally to review of a labor-arbitration award. *Cf. Misco*, 484 U.S. at 40 n.9 (using Federal Arbitration Act as source of principles for federal common law of labor arbitration).

Cir. 1992) (quoting *Misco*, 484 U.S. at 38)). Such review serves only to ensure that any dubious interpretation or application of a CBA's time limits was at worst a "serious error," and not evidence that the arbitrator completely disregarded the CBA in order to "dispense his own brand of industrial justice." *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960).

2.  *Timeliness*

The arbitrator found that, while the company sporadically announced a 20-minute-report-time policy over a four-year period, it backed down each time employees protested, until in August 1994 it warned an employee in writing for failing to board a van over 15 minutes before a shift. The arbitrator then drew a legal conclusion that

> [t]he instigating cause of a grievance is when an employee . . . believes that [his or her] rights under the [CBA] have been violated. That occurred in this case when the Company's interpretation of the 1990 changes was first enforced in application to one or more specific employees. . . . [T]hat first occurred in August 1994 and was timely grieved.

The CBA requires employees to submit grievances within 15 days "of the incident giving rise to the grievance or of notice or knowledge of such incident, if later." Mangum's award did not expressly find whether, during the four years before the grievance, employees *ever* reported for transportation 20 minutes early; he only said that "[e]mployees . . . would protest that requirement and it would

-15-

either not be enforced or would be withdrawn." Mangum's May 13 letter, however, strongly implied that at least some employees did report 20 minutes early some times: "It was my conclusion that it would be impossible to determine which and how many employees would have been on those vans for how many minutes prior to the contractual 15[-]minute[-]prior departure. Therefore, I attempted no remedy for those additional minutes . . . ." And as Kennecott stresses, the grievance itself also strongly suggests that at least some employees did report for transport more than 15 minutes before their shifts in 1990–94.

In finding that Kennecott consistently withdrew or did not enforce the 20-minute rule, and ruling that there was no grievable "incident" until it disciplined an employee for refusing to obey that rule, Mangum did one of two things. He may have simply ignored, in making his factual findings bearing on timeliness, the evidence that the rule did function for some periods of time. This possibility, which Kennecott stresses, is simply irrelevant to this court's review. It does not matter that an arbitrator's express factual finding may have ignored or contradicted some or even all of the evidence; his or her factual findings are beyond review. *See Champion Boxed Beef*, 24 F.3d at 87. Alternatively, Mangum may have made an implicit finding that the rule did function for some periods, but then drawn a legal conclusion that, when an employer sporadically applies a rule that violates a CBA, and some employees comply with the rule for some period or

periods of time, no incident triggers the time limit to file a grievance until an employee refuses to follow the rule and the company disciplines him or her rather than withdrawing the rule. Kennecott has not shown that the CBA expressly forbade Mangum to use such a theory of when a grievance arises. He was at least arguably applying or interpreting the contract in so reasoning. It is thus irrelevant whether his interpretation of the provision is the best one, plausible, or even erroneous. *See Misco*, 484 U.S. at 38.

D.    Merits

Kennecott argues that Mangum's award does not draw its essence from the CBA. Kennecott does not suggest any material other than the CBA from which the award drew its essence. Thus, the only way that it can show that Mangum failed to interpret and apply the CBA in good faith would be to show that his award wholly ignores the agreement's plain language. The gist of Kennecott's argument is that Mangum ignored the rule that the SA trumps the MA in case of conflict and wrongly required Kennecott to pay for travel time.

As for the first argument, Mangum never said that the MA controls over the SA *in case of conflict*. Nothing in his award suggests that he did not recognize that the SA controls in case of conflict. He simply interpreted the MA and SA so that, in his view, they did not conflict. The award says that the MA clause providing that transportation will depart from designated points 15 minutes before

shifts begin "remains the governing language in the [MA]." The award then specifies that neither that clause "nor the language of [the SA] specify that the latter in any way modifies, replaces, or supersedes [that clause] of the [MA]." Mangum sought to apply both clauses, and did not deny that the SA would control if they did conflict; this court cannot review the merits of the interpretation whereby he reconciled the two contractual provisions.

Kennecott also argues that the award requires it to pay for travel time. Noting the contract's language and bargaining history, Mangum concluded that the CBA "specifically prohibit[s]" travel pay. At first blush, however, his award seems to require just that. He banned Kennecott from making employees board vans more than 15 minutes before their shift. The SA says that employees who "report and work prior to the shift will be paid 20 minutes at a rate and one half." To "work prior to the shift," Kennecott notes, employees must get to the worksite prior to the shift. Kennecott must pay them 20 minutes, but can only make them report 15 minutes before their shift begins. If they spend those 15 minutes on a van, Kennecott will have to pay for travel time.

If that were the only way to read Mangum's award, it would contravene the rule barring travel-time pay. This court would then have to decide whether such an interpretation was merely a serious error, or was instead "'so unfounded in reason and fact, so unconnected with the wording and purpose of the . . .

agreement as to 'manifest an infidelity to the obligation of the arbitrator.'" *Mistletoe Express Serv. v. Motor Expressmen's Union*, 566 F.2d 692, 694 (10th Cir. 1977) (quoting *Brotherhood of R.R. Trainmen v. Central of Ga. Ry. Co.*, 415 F.2d 403, 415 (5th Cir. 1969) (quoting *Enterprise Wheel*, 363 U.S. at 597)).

That inquiry is unnecessary, however, for this court does not read the award to require pay for travel time. The award bars Kennecott from making employees report for transportation more than 15 minutes before a shift, and says that this rule coexists with the rule of 20 minutes' pay for "employees . . . who report and work prior to the shift." But the award does not expressly require pay for employees who report 15 minutes early and spend all 15 minutes in travel. The only employees for whom the award necessarily requires 20 minutes' pay are those who, despite boarding vans no more than 15 minutes before their shift, get to the work site and in fact do some work before the shift starts.

This court agrees with Mangum that the 20-minutes'-pay rule contemplates payment of a set amount of money regardless of how many minutes an employee works before any given shift. It says that "in compensation for extended *average* work-time, employees . . . who report and work prior to the shift will be paid *20 minutes* at a rate and one-half *for each . . . shift*" (emphases added). It does *not* say, "employees will be paid *for however many minutes they work before each shift* at a rate and one-half." The clause explains that the 20 minutes' pay

-19-

compensates for "extended *average* work time," not for the actual number of

minutes of extended work by a given worker on a given shift. It requires

Kennecott to provide 20 minutes' pay "for each . . . shift." The amount of pay is

plainly unrelated to the number of minutes worked before any particular shift.

The arbitrator was thus at least arguably construing or interpreting the CBA,

and not wholly ignoring it, when he concluded that the disputed clause allows

employees to board a van 15 minutes before a shift; reach their work site 2, 5, or

10 minutes before their shift; work for those 2, 5, or 10 minutes; and receive 20

minutes' pay at a rate and one-half. Kennecott's other arguments merely allege

error in Mangum's interpretation of the CBA, and are irrelevant.

E.    The Clarification Letter/Second Award

Kennecott challenges Mangum's May 13 letter, which he called a

"clarification" but which Kennecott describes as a second award. (This opinion

will refer to the May 5 initial award as "the award" and the May 13 letter as "the

letter.") Kennecott bases its challenge on two overlapping grounds: the *functus*

*officio* doctrine,[4] and the *ex parte* character of the union's request to Mangum to

clarify his initial award.

---

[4]This Latin term for "task performed" is shorthand for the common-law rule that, once an arbitrator has issued a final award and thus discharged his or her office, that arbitrator lacks any continuing power to revise the award or issue a new one. *See, e.g.*, *Black's Law Dictionary* 673 (6th ed. 1990); *Glass, Molders, etc. Union v. Excelsior Foundry Co.*, 56 F.3d 844, 845 (7th Cir. 1995).

This court has expressly reserved the question whether the body of federal common law governing review of labor-arbitration awards incorporates the State common-law doctrine of *functus officio*, which bars an arbitrator from altering or adding to a final award. *See Ideal Cement*, 762 F.2d at 841 n.3; *see also Glass, Molders, etc. Union v. Excelsior Foundry Co.*, 56 F.3d 844, 846 (7th Cir. 1995) ("The doctrine originated in the bad old days when judges were hostile to arbitration and ingenious in hamstringing it . . . . Today, riddled with exceptions, it is hanging on by its fingernails and whether it can even be said to exist in labor arbitration is uncertain."). Many courts have limited the doctrine to allow arbitrators "to correct mistakes, complete awards which were not final, and clarify ambiguities." *Ideal Cement*, 762 F.2d at 841 n.3. The clarification exception to the doctrine is well settled, and Mangum labeled his letter a clarification.[5]

Kennecott argues that the May 13 letter does not satisfy that exception, as it added to or altered the original award instead of just clarifying it. It also argues that Mangum, by responding to Holland's *ex parte* contacts, denied it a chance to be heard. Kennecott relies on a Third Circuit opinion deeming it "axiomatic that

---

[5]Judge Campbell concluded that the letter had either clarified the award's ambiguous reference to making employees whole, or completed the award by addressing the unresolved issue of back-pay. *Cf. International Bhd. of Teamsters v. Silver State Disposal Serv., Inc.*, 109 F.3d 1409, 1411 (9th Cir. 1997) (noting without concern that some courts have commingled clarification and completion exceptions to *functus officio* rule).

a district court may vacate an award if a party to an arbitration proceeding has not been given notice and opportunity to present arguments and evidence." *Teamsters Local 312 v. Matlack, Inc.*, 118 F.3d 985, 995 (3rd Cir. 1997). *Matlack*, however, only says that courts "may" vacate awards because of *ex parte* contacts. *Id.* at 995. *Matlack* and several opinions from other circuits plainly state or necessarily imply a rule that *ex parte* contacts must have prejudiced the party resisting enforcment of an arbitral award. *See id.* (adopting rule developed under Federal Arbitration Act that court "has the power to vacate an arbitration award where an arbitrator receives *ex parte* information to the prejudice of one of the parties"); *Excelsior Foundry*, 56 F.3d at 846; *M & A Elec. Power Coop. v. Local U. No. 702, Int'l Bhd. of Elec. Wkrs.*, 977 F.2d 1235, 1237–38 (8th Cir. 1992); *see also, e.g.*, *Employers Ins. of Wausau v. National U. Fire Ins. Co. of Pittsburgh*, 933 F.2d 1481, 1490–91 (9th Cir. 1991) (requiring prejudice to vacate commercial arbitration award because of *ex parte* contacts, and citing similar commercial-arbitration precedents). Because this court agrees that there is no rule of *per se* nonenforcement upon a showing of *ex parte* contact, we must determine whether Kennecott has shown prejudice.

The prejudice inquiry effectively merges in this case with the *functus officio* inquiry. The one undisputed purpose of Mangum's letter was to clarify the award's ambiguity regarding back-pay. Kennecott plainly benefitted from that

clarification. Kennecott must therefore show that the letter did more than clarify the back-pay issue in order either to place the letter outside the clarification exception, or to show that Holland's *ex parte* contacts prejudiced Kennecott. Accordingly, this court must determine if the letter added anything adverse to Kennecott that the award had not already said or necessarily implied.

Kennecott claims several differences between the letter and the award.[6] The first is the letter's allegedly new "cease and desist" order. While the words "cease and desist" are new, this court agrees with the district court that the substantive message they convey is merely the necessary implication of the original award's finding of a violation. This court is no more able than the district court was to understand how Mangum could merely have intended the award to note the violation, leaving Kennecott free to continue it until he "added" in the letter a requirement that Kennecott cease and desist from said violation.

Kennecott suggests several other differences between the letter and the award, but all are plainly illusory. Kennecott asserts that the letter, unlike the

---

[6]Kennecott also argues that the letter did not merely clarify the back-pay issue, because Holland's *ex parte* letter had argued four separate points. Holland's letter, however, only seems to significantly argue the backpay issue; it merely restates the arbitrator's initial rulings on the other three issues it discusses. But even assuming that Holland did "argue" the other points, the relevant question is not what the union argued, but whether Mangum's letter responding to those improper arguments altered or augmented the initial award, and thus prejudiced Kennecott.

award, deprives it of its "contractual right to 'designate' employees to 'report and work prior to the shift.'" This is simply untrue: the letter only prohibits Kennecott from designating employees to report for transportation *more than 15 minutes prior* to their shift. It also claims that the award allowed it to require its employees to report to work more than fifteen minutes before shift starting time if it compensated the employees with 20 minutes' pay, but that the letter altered this rule by flatly banning Kennecott from requiring employees to report more than 15 minutes early. To the contrary, the award carefully explained that the reporting-time and pay provisions are separate, and unqualifiedly held that "[r]equiring departure from designated reporting points prior to 15 minutes before shift starting times is a violation of the [CBA]." It did not say ". . . unless the company provides 20 minutes' pay." Nothing in the award supports Kennecott's reading.

Kennecott also argues that the award only addressed "departure time," while the letter introduced the purportedly separate concept of "reporting time." The award, however, repeatedly refers interchangeably to the question of when employees must arrive at the designated transport-departure point in terms of "reporting" and "departure." This is clear in the sentence, "Article 11 E 2 is a *reporting* provision and continues to govern *departure* of transportation" (emphases added). Kennecott argues, finally, that the letter imposed a new rule

that it may not "substitute any other practice for the duration of this agreement." Kennecott suggests that this language limits its options more sharply than had the award. But the "any other practice" language follows the sentence, "Both the [MA] and [SA] provisions in question are valid and must be obeyed." It does not specify any particular practice which Kennecott may not alter, or limit Kennecott's freedom any more than the award.

Kennecott has thus failed to demonstrate that the letter augmented or altered the award in any way other than clarifying that Mangum had not awarded backpay. The letter thus fell within the clarification and/or completion exceptions to the *functus officio* doctrine. The undisputedly improper *ex parte* contacts did not prejudice Kennecott, and thus did not warrant a refusal to enforce the award.

F.   The Order's Alleged Lack of Adequate Findings or Conclusions

Kennecott acknowledges that Federal Rule of Civil Procedure 52(a) makes findings of fact and conclusions of law unnecessary in a summary judgment. *See Viernow v. Euripides Dev. Corp.*, 157 F.3d 85, 792 n.13 (10th Cir. 1998). It nonetheless urges this court to set aside the judgment because the district court allegedly failed to explain its reasoning in sufficient detail to permit review. This argument borders on the frivolous. The court explained the reasoning for its decision cogently and at some length in its comments from the bench after ruling orally. The court then noted that it would "prepare a very brief order" granting

summary judgment, which it did.  Kennecott seems to suggest that the court was required to reproduce its reasoning in the written order, but it cites no authority for that novel proposition.  *Cf. Gomez v. American Elec. Power Serv. Corp.*, 726 F.2d 649, 654 n.4 (10th Cir. 1984) (deeming findings and conclusions helpful for purposes of review). The court's oral comments plainly suffice to explain the basis of its judgment and permit review thereof.

IV.  CONCLUSION

Kennecott has not overcome the deferential standard for judicial review of the merits of labor-arbitration awards.  Nor has it shown that the timeliness, *ex parte*, or *functus officio* issues compel this court to apply a less deferential standard of review and deny enforcement.  This court thus **AFFIRMS** the order enforcing the award.