**PUBLISH**

**March 6, 2012**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

SAN JUAN COAL COMPANY,

      Plaintiff–Appellee,

v.

INTERNATIONAL UNION OF
OPERATING ENGINEERS, Local 953,

      Defendant–Appellant.

No. 11-2071

---

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:10-cv-00099-MV-LFG)**

---

Shane Youtz (Marianne Bowers with him on the briefs), Youtz & Valdez, P.C.,
Albuquerque, New Mexico, for Defendant-Appellant.

Patrick Richard Scully (Matthew M. Morrison with him on the briefs), Sherman &
Howard L.L.C., Denver, Colorado, for the Plaintiff-Appellee.

---

Before **LUCERO**, **MCKAY**, and **TYMKOVICH**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

An arbitrator's interpretation of an agreement, even one that is flawed or based on questionable findings of fact, is due the utmost judicial deference. It matters not that a reviewing court might offer a more cogent reading of the agreement; the arbitrator's interpretation must be upheld wholly unless it is without any textual basis.

San Juan Coal Company ("San Juan") and the International Union of Operating Engineers, Local 953 entered into binding arbitration to determine whether union members on a certain schedule were entitled to holdover pay. The arbitrator concluded that the union members were entitled to the extra pay, but on review, the district court overturned the arbitral award. Because the arbitrator's interpretation was colorable, we hold that the district court improperly substituted its interpretation of the agreement. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse.

**I**

San Juan operates an underground coal mine near Farmington, New Mexico. Workers in the mine are unionized, and the terms of their employment are set forth in a collective bargaining agreement ("CBA"). The CBA's section on overtime pay provides that "time worked beyond the scheduled hours for a particular day will be paid at one and one-half times (1 ½) the normal rate of pay." It also includes a "holdover pay" provision, which states that "an employee . . . required to work for two (2) hours after the completion of their shift . . . will be paid an additional one half hour at one and one-half times (1½) the normal rate."

In an effort to reduce operational costs, San Juan entered into negotiations with the

union to establish reorganized worker schedules. The fruit of this bargaining was a two-page Memorandum of Agreement ("MOA").

The MOA set the terms of a new schedule that it defined as a "weekend shift." This new schedule provided workers with four days off followed by three consecutive work days. The agreement dictated that although a "normal workday shall be no more than ten (10) consecutive hours[,] . . . [t]he weekend shift will include an additional two (2) hours of mandatory overtime." A heading in the MOA described this schedule as "3/10+2 OT Hours Weekend Shift." Another provision stipulated that "Leave Bank for a Weekend Shift (10 Hour Shift + 2 Hours OT) will be accounted for by 10 hours of Leave Bank utilized." Workers on the weekend schedule were thus required to work a total of 36 hours each week. The MOA stated that it does not affect any other provision of the CBA and that all workers covered under the CBA "will continue as full time employees, with no loss of benefits."

Approximately one month after the parties executed the MOA, the union filed a grievance arguing that the weekend shift workers were wrongfully denied holdover pay. According to the union, the "shift" for the purposes of the holdover pay provision consisted of ten hours of regular pay. Under this theory, the two hours of mandatory overtime were "after completion of [the workers'] shift," entitling them to an additional half-hour of pay at one and a half times their base rate. San Juan disagreed, contending that the weekend "shift" was the entire twelve-hour work period, meaning that holdover pay was not required unless the workers stayed for two hours beyond their normal twelve

hours.  To settle their dispute, the parties entered into binding arbitration.

Following an arbitration hearing in which testimony and documentary evidence were presented, the arbitrator sided with the union.  In reaching his conclusion, the arbitrator stated that the MOA "explicitly identifies the Weekend Shift as a ten (10) hour shift."  To further support his conclusion, the arbitrator cited the MOA's statement that the "normal workday shall be no more than ten (10) consecutive hours of work," implicitly reasoning that "normal workday" and "shift" were synonymous.  Additionally, the arbitrator relied on the MOA's guarantee of "full time" employment.  Based on its finding that "full time in the world of work is forty (40) hours per week," the arbitrator reasoned that San Juan's interpretation would violate the MOA's full-time guarantee because workers would only be compensated for 39 hours of work.

Unhappy with this outcome, San Juan sought to overturn the arbitration award pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185.  Both parties moved for summary judgment.  The district court granted San Juan's motion and vacated the arbitrator's decision.  Although the court acknowledged that its power to review the arbitral decision was limited, it concluded that the arbitrator lost sight of the plain language of the MOA and CBA.  Specifically, it rejected the arbitrator's assertion that the MOA "identifies the Weekend Shift as a ten (10) hour shift," instead concluding that "the MOA clearly and repeatedly identifies the entire twelve-hour work period at issue as a 'weekend shift.'"  The court also reasoned that the arbitrator's attempts to define "normal workday," "shift," and "full time" had no basis in the text of the agreements.  Although

the court acknowledged that the MOA contained some inconsistencies, it nevertheless concluded that the arbitrator's decision was indefensible.

## II

We review a grant of summary judgment in a labor arbitration case de novo. Kennecott Utah Copper Corp. v. Becker, 186 F.3d 1261, 1266 (10th Cir. 1999). Judicial review of an arbitral award, however, "is among the narrowest known to law." Champion Boxed Beef Co. v. Local No. 7 United Food & Commercial Workers Int'l Union, 24 F.3d 86, 87 (10th Cir. 1994) (quotation omitted). An arbitrator's factual findings are beyond review, as is her interpretation of the contract as long as it does not ignore the plain language of the collective bargaining agreement. Id. at 87.

The Supreme Court has emphasized that vacating an arbitral award is warranted only in extraordinary circumstances. If an "arbitrator is even arguably construing or applying the contract and acting within the scope of his authority," the arbitral award should be upheld. Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509 (2001) (per curiam) (quotation omitted). An arbitral award may be vacated only if the arbitrator "strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice." Id. (quotation and alteration omitted). To show less deference would risk "improperly substitut[ing] a judicial determination for the arbitrator's decision that the parties bargained for." Id. at 510 (quotation omitted).

## III

After reviewing the CBA and MOA, we conclude that the arbitrator's decision had

at least some foundation in the text of the controlling agreements and must be upheld. This is not to say that the district court's interpretation of the agreements was in any way flawed or illogical. But a court's review of an arbitral award is far removed from the usual de novo standard of review. Thus, although the MOA refers to the entire twelve-hour period as a "shift" in some places, the fact that the leave bank provision contains the phrase "10 Hour shift" provides a sufficient textual basis to sustain the arbitrator's interpretation. Moreover, the arbitrator's determinations that "normal workday" and "shift" were synonymous and that "full time" meant 40 hours per week, while not explicitly dictated by the text of the MOA, were nonetheless defensible constructions of the agreement. See Champion Boxed Beef, 24 F.3d at 88-89 ("[A]n arbitrator may consider and rely upon extrinsic evidence, including negotiating and contractual history of the parties, evidence of past practices, and the common law of the shop, when interpreting ambiguous provisions.").

The district court correctly recited the narrow standard at the outset of its opinion, but its analysis strayed from the highly deferential review mandated by our jurisprudence. Specifically, the court acknowledged at least one inconsistency in the MOA's definition of "shift," but nonetheless overturned the arbitrator's interpretation of that term. That constitutes error. As long as the arbitrator's conclusion has some textual basis, the fact that "a court is convinced he committed serious error does not suffice to overturn his decision." Major League Baseball, 532 U.S. at 509 (quotation omitted).

In looking to extrinsic evidence of the parties' intent, the court further erred.

-6-

Although such evidence is well within an arbitrator's purview, <u>Champion Boxed Beef</u>, 24 F.3d at 88-89, a court must limit itself to the narrow question of whether the arbitrator's decision lacked any basis in the contractual text. To go beyond that "usurps a function which . . . is entrusted to the arbitration tribunal." <u>Major League Baseball</u>, 532 U.S. at 510 (quotation omitted).

## IV

The order of the district court vacating the arbitral award is **REVERSED**, and the case is **REMANDED** with instructions to enter an order of enforcement.